**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **TERESA PATTERSON and** | ) | |
| **NECHIE WOODARD,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 2:11-cv-00115** |
| **v.** | ) | |
| | ) | **Judge Sharp** |
| **NORTH CENTRAL TELEPHONE** | ) | |
| **COOPERATIVE CORPORATION** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiffs' complaint before this Court alleges unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. (Title VII), 42 U.S.C. § 1981 (§ 1981), and the Tennessee Human Rights Act (THRA). Defendant North Central Telephone Cooperative, Inc. ("NCTC" or the "Cooperative") has filed a Motion for Summary Judgment as to Plaintiff Teresa Patterson (Docket No. 86) and a Motion for Summary Judgment as to Plaintiff Nechie Woodard (Docket No. 81). These motions, for the reasons that follow, will be granted in part and denied in part.

## I.  FACTUAL BACKGROUND

Defendant NCTC is a telecommunications cooperative based in Lafayette, Tennessee, that provides phone, Internet, cable television, and security systems to Cooperative members in Macon County and the surrounding area. Nancy White has served as President and CEO of NCTC since May 2009.

Plaintiffs Teresa Patterson and Nechie Woodard are former employees of NCTC. Ms. Patterson was NCTC's Human Resources manager from July 1999 to March 2010. Mr. Woodard worked at NCTC for more than twenty years, most recently in the warehouse.

In February 2010, NCTC posted job openings for two Line Technician positions and received hundreds of resumes. Ms. Patterson collected the applications, screened them, and consolidated the candidate base. She then interviewed approximately 60 candidates, including Mr. Malone, the sole African-American applicant. Mr. Malone had initially learned of the job from Mr. Woodard, who also served as a reference. The two had developed a relationship over the years as Mr. Malone made deliveries to Mr. Woodard in the warehouse.

The lack of diversity in the applicant pool was not unusual at NCTC. The Cooperative's homogenous workforce is attributed, at least in part, to a practice of hiring exclusively from residents within its Service Area, which has an exceedingly small minority population. Defendant offers a legitimate business reason for the requirement: it allowed technicians to respond to customers' emergency service calls more quickly. (Docket No. 87 at 12). Plaintiffs counter that this practice was actually motivated by a conscious effort to exclude minorities from the company. (Docket No. 25 at ¶ 56).

After the initial round of interviews, Ms. Patterson recommended to Ms. White that Mr. Malone continue to the next round. She noted that while Mr. Malone did not currently live within the Service Area, he would relocate for the job. Plaintiffs claim Ms. White was generally disinclined to follow the recommendation and stated that a willingness to move did not satisfy the Service Area requirement. (Docket No. 25 at ¶ 21). A day or two later, Ms. Patterson was fired from NCTC without explanation. (Docket No. 25 at ¶ 22-23).

Despite Ms. White's purported reticence, Mr. Malone was interviewed for a second time by NCTC supervisors. However, soon after, an "outside source" warned Mr. Malone that he would not be hired because "North Central Cooperative was a racist company & would never consider hiring a black man … " (Docket No. 25-1).[1] Mr. Malone reported this in a letter to NCTC, lamenting, "our money is good enough to pay for your services. however: [*sic*] our abilities to work for you are lacking." (Id.). Mr. Malone alerted NCTC that he had been "treated wrongfully" by the three supervisors who interviewed him, but was still interested in the job. If NCTC did not remedy the situation, however, he would have "NO other choice than to contact the NAACP and EEOC." (Id.). Mr. Malone was later offered the position and remains employed at NCTC.

Plaintiffs claim that after Mr. Woodard recommended Mr. Malone, he became the target of ridicule and harassment at work. Along with Ms. Patterson, Mr. Woodard acquired representation and entered into mediation with NCTC to resolve their dispute in July 2010. Plaintiffs' counsel alerted Defendant that his clients would file charges of discrimination with the EEOC and prosecute their claims if they could not otherwise be resolved. The day after the unsuccessful conclusion of the mediation, NCTC and Ms. White, in her capacity as President and CEO, filed a lawsuit in Tennessee state court against Ms. Patterson alleging that she violated the state's Wiretap Act, TCA 39-13-601(a). Approximately two weeks later, Plaintiffs filed charges of discrimination with the EEOC.

Plaintiffs' complaint before this Court alleges unlawful discrimination and retaliation in violation of Title VII, § 1981, and the THRA, as a result of their recommendation of Mr. Malone for employment. Mr. Malone initially considered joining Plaintiffs in the current lawsuit.

---

[1] Defendant contends this outside source was in fact Mr. Woodard.

Apparently to this end, Ms. Patterson left Mr. Malone two voicemail messages explaining the opportunity "means money." (Docket No. 116 at 23-24). Mr. Malone went so far as engaging Plaintiffs' counsel, but abandoned the lawsuit when NCTC subsequently hired him in April 2010.

### A. Teresa Patterson

Plaintiffs contend the causal connection between Ms. Patterson's recommendation of Mr. Malone and her immediate termination from NCTC is clear. During her eleven years as Human Resources Manager, Ms. Patterson earned consistent positive feedback. She received favorable performance reviews and was never written up or disciplined for misconduct. In fact, Plaintiffs claim that the same week she was fired, Ms. White told Ms. Patterson "she had been doing a good job and that, as a result, she would be receiving a merit increase in her annual salary," which Ms. White subsequently approved. (Docket No. 25 at ¶ 15.) When Ms. Patterson was fired, Ms. White offered no explanation or justification for her termination.

Plaintiffs point to a pattern of discrimination at NCTC to further support the claim Ms. Patterson lost her job as a consequence of recommending a black applicant.[2] The Cooperative receives federal funds from Rural Utility Services and as such, is subject to affirmative action requirements of Executive Order 11246.[3] However, Mr. Malone is its first permanent minority employee. During her first year with NCTC, Ms. Patterson drafted an affirmative action plan but was later advised by Eric Sevens, counsel for NCTC, that NCTC was exempt from this

---

[2] As Defendant notes repeatedly, Plaintiffs do not make a "pattern and practice" claim. Instead, this information is offered as further justification for their argument that they were fired for suggesting a black applicant. Defendant's Motion to Sever and to Dismiss (Docket No. 12) was grated insofar as Plaintiffs alleged discrimination based upon a pattern and practice and/or disparate impact. (Docket No. 24).

[3] This order prohibits discrimination in employment decisions on the basis of race, color, religion, sex, or national origin, and requires employers take affirmative action to ensure an equal opportunity is provided in all aspects of their employment. See Exec. Order No. 11,246, 3 C.F.R. 339, (1964-1965).

requirement because of its status as a cooperative. (Docket No. 116 at ¶ 227). The plan was never implemented. (Id.). When Ms. Patterson asked how else she could improve diversity, Mr. Stevens instructed that her responsibility as affirmative action officer was satisfied by "track[ing] every applicant to show that she did not have diverse applicants so NCTC did not discriminate because she did not have a diverse applicant pool." (Id. at ¶ 228). Plaintiffs claim that Ms. Patterson repeatedly requested that the Service Area requirement be abolished and questioned the policy "almost every time a position was open." (Id. at ¶ 235). Notably, NCTC has since abandoned this practice in order to comply with its affirmative action obligations. (Docket No. 120-13 at 288-92).

Defendant offers a different version of Ms. Patterson's tenure at NCTC, claiming she was a problematic employee long before Mr. Malone applied, and never undertook efforts to recruit minority candidates within the Service Area. In 2008, Board Members "raised issues" concerning Ms. Patterson during a meeting of the Board of Directors.[4] (Docket No. 87 at 3-4). Interestingly, however, a PowerPoint slideshow presented at the board meeting largely reflects Plaintiffs' description of Ms. Patterson's reputation at the Cooperative, noting she "[h]as received and exceeds performance appraisal 5 years in a row" and has "[n]othing negative in her personnel file pertaining to job performance." (Docket No. 91-5 at 7-9).

Nonetheless, when Ms. White joined NCTC in the spring of 2009, she soon became concerned that Ms. Patterson's approach did not fit her management style. Defendant asserts that by October 2009, Ms. White had decided to replace Ms. Patterson due to concerns over her professionalism, reliability, and trustworthiness. (Docket No. 87 at 4). She began compiling a

---

[4] These issues related to Ms. Patterson communicating with the Board directly (rather than going through the interim CEO), the number of part-time employees in the Human Resources department, her involvement in a new candidate's campaign for a position on the Board, and a delay in insurance coverage for a Board Member's spouse. (Docket No. 86-4 at 87-88).

severance package in late January 2010, but Ms. Patterson was not actually terminated until March 5, 2010. Ms. White attributed the delay to her busy schedule at the time. (Docket No. 120-13 at 111-14). Defendant further contends Ms. White never intended to provide Ms. Patterson with a merit raise given her impending termination and that her pay change form was signed in error. (Docket No. 87 at 8-9).

### B. Nechie Woodard

Soon after recommending Mr. Malone for the line technician position, Mr. Woodard claims he became the target of discrimination and retaliation at NCTC. He claims his supervisor stated, "Why did you recommend Dondi? We ought to kick your ass." (Docket No. 111 at ¶ 15). In the same conversation, Mr. Woodard alleges his supervisor said, "I should fire your ass for sending that black man down for a (sic) interview." (Id. at ¶ 16). The supervisor later claimed his statements were made in jest but was disciplined with two days suspension without pay and a written warning.

Soon after, Mr. Woodard claims he received a call from an unknown number asking him to check a shed on NCTC grounds. He forgot about it until he arrived at work the next day and found a noose in the warehouse. He immediately called the interim Human Resources Director, who instructed him to take photos of the noose and accompanied him to the shed, where they found a second noose. A review of warehouse security cameras revealed that coworker Matt Wyatt had tied the first noose. Mr. Wyatt maintained he did not think of the noose as an object with racist symbolism, did not intend to target Mr. Woodard, and did not know Mr. Woodard had recommended a black candidate for the line technician position. He was suspended for two weeks without pay and received a written warning from Ms. White. An NCTC investigation did not resolve the question of who tied the second noose.

Mr. Woodard's complaints about the noose incident rankled other NCTC employees, who took up a collection to cover Mr. Wyatt's wages while he was on disciplinary leave. (Docket No. 111 at ¶ 37-38). Three weeks after Mr. Wyatt's suspension, in May 2010, a number of coworkers filed complaints against Mr. Woodard for telling a racist joke. Their stories differed – one coworker thought he had told the joke in March, one remembered him telling it in May, and a third reported Mr. Woodard told it in both March and May. None who claimed to have heard the joke explained their delay in reporting the incident. Instead, their statements emphasized the injustice of one who complained of discrimination telling inappropriate jokes himself. One coworker noted, "I don't see how Nechie can tell a joke like this one day and then turn around a few days later and claim racism on an incident by another employee, when the joke he told was just as racist." (Docket No. 98 at 6).

Given the circumstances, NCTC emphasized in its incident report, its investigation purposefully sought to "ensure that other employees were not complaining merely because [Mr. Woodard] had complained about another employee leaving a noose in the warehouse earlier in the year." (Docket No. 111 at ¶ 49). The investigation ended in mid-July and concluded that Mr. Woodard's version of events was improbable, that the joke "took place" and was "committed by the accused." (Docket No. 12 at ¶ 59). He was suspended for two weeks without pay.[5] Mr. Woodard noted on his Corrective Action Form at the time of his suspension that he felt it was an "act of retaliation for filing suit against NCTC and with EEOC." (Docket No. 98 at 9).

Mr. Woodard went on FMLA leave from mid-July to mid-September 2010 to treat a heart condition. He filed his first EEOC claim in August. He claims that on his return, NCTC did not accept the usual form from his doctor and required additional documentation. He further claims

---

[5] Mr. Woodard served his suspension in September 2010 after returning from FMLA leave.

that he returned to work to find the warehouse bathroom soiled and his nameplate removed from over the door. While he was away, NCTC had hired a consultant to increase efficiency in the warehouse, and Mr. Woodard contends his work became much more physically demanding than it had been previously.

Mr. Woodard resigned from NCTC on November 22, 2010, citing "retaliation, hostile work environment, discrimination, and harassment" as the cause of his departure. (Docket No. 98 at 10). Thereafter, Mr. Woodard briefly held two other positions. He was terminated from the first for misuse of a company vehicle but was soon hired by MasTec, a subcontractor of NCTC. He had not yet started working when NCTC contacted MasTec to request that he be removed from all of their projects. Plaintiffs claim NCTC threatened to end their contract with MasTec entirely if it did not comply.

Also around this time, Mr. Malone complained to NCTC Human Resources that his family was being harassed through posts on an Internet message board. NCTC worked with local police to discover the messages emanated from Mr. Woodard's IP address. Mr. Woodard contends he did not write the messages and that NCTC employees were able to make the messages appear to have come from his address. Mr. Malone also complained that Mr. Woodard was harassing him through frequent calls to his home and a prayer request to Mr. Malone's church but an NCTC investigation concluded these calls were a mere "nuisance" and that the coworkers could resolve the problem privately.

### C. Initial efforts to resolve the dispute

On May 21, 2010, after Ms. Patterson's termination but while Mr. Woodard was still employed, Plaintiffs' attorney wrote a letter to NCTC addressed to Ms. White asserting his clients' grievances. He stated:

> I find it concerning to learn that North Central has a blatant discriminatory hiring policy…that has, in fact, resulted in discriminatory practices…My clients both have numerous claims. Before moving forward with litigation, they have authorized me to engage in discussions with North Central in an attempt to resolve this matter.

(Docket No. 113 at 11-12). The Parties' communications about the substance of the discrimination claims culminated in an agreement to attend confidential mediation in an effort to address their claims of discrimination and retaliation. (Id. at 12).

After the mediation failed, Ms. Patterson and Mr. Woodard each promptly filed a charge of discrimination with the EEOC. (Docket No. 1-2). Mr. Woodard filed an additional EEOC charge in April 2011 complaining that NCTC's refusal to work with him caused his subsequent employer, MasTec, to terminate his employment. (Docket No. 1-4). Ms. Patterson also filed a second charge complaining NCTC had filed a lawsuit against her for "attempt[ing] to obtain monies from North Central Cooperative to which [she] was not entitled" in July 2011. (Docket No. 1-3).

### D. The State Claim

Around January 2010, a telephone conversation between Ms. White and the Chairman of the NCTC Board of Directors was recorded in the course of routine monitoring. NCTC technician Ricky Rather listened to the conversation while troubleshooting a connection problem and heard a negative comment made by the Chairman about NCTC technicians. In anger, Mr. Rather claims he copied the conversation and distributed it to coworkers. He later admitted this to Ms. White, but she was "never able to prove there was [a CD]" and, if there was, what happened to it. (Id. at 273). A subsequent FBI investigation concluded that Mr. Rather had not violated any federal law and NCTC decided to handle the matter internally.

In June 2010, after the parties had agreed to pursue pre-trial mediation, Ms. Patterson left a voicemail message for Ms. White:

> Hey, Nancy White, this is Teresa Patterson. I thought I needed to let you know that one time you asked me for a big favor. You wanted a copy of a tape that had been circulating around to some employees, and I didn't have that copy but I have it now. So, I just thought I'd let you know I have that, and I have some other ones, too. It's nice to have good friends that work at North Central. Thanks a lot. Bye.

(Docket No. 87 at 14). Plaintiffs maintain that Ms. Patterson never actually possessed the recording and only claimed to in this message out of anger. (Docket No. 101 at 8). Defendant cites this message as a clear threat to use the conversation recorded by Mr. Rather, as well as others, "either for her personal benefit or to the detriment of NCTC or Ms. White individually." (Docket No. 112 at 3).

NCTC filed a lawsuit in state court against Ms. Patterson alleging she was "intentionally using, endeavoring to use, intentionally disclosing or endeavoring to disclose the contents of those recorded conversations and seeking return of all copies of the conversations Ms. Patterson said she possessed as well as damages." (Docket No. 87 at 14-15). Defendants maintain that whether Ms. Patterson actually had or has the recordings is immaterial to whether she violated the Wiretap Act. (Docket No. 113 at ¶ 47).

NCTC has not brought claims against Mr. Rather or any other employee of NCTC in connection with this issue.

The state court considered the Parties' cross motions for summary judgment and found, *inter alia*, that:

Ricky Rather's initial listening to the recording of the telephone call between Nancy White and Royce Halliburton did not violate Tenn. Code Ann. §39-13-601. However, when Ricky Rather downloaded, copied, or otherwise placed the telephone conversation on a ".wav" file, that action, as a matter of law, constituted an interception of a wire, oral or electronic communication in violation of Tenn. Code Ann. §39-13-601. The Court also finds that when Ricky Rather e-mailed the telephone conversation to his personal computer and when he "burned" the aforementioned telephone conversations on to discs, that action also constituted an interception of a wire, oral or electronic communication in violation of Tenn. Code Ann. §39-13-601. Therefore, the Court finds, as a matter of law, that the Plaintiffs have established that the content of the subject telephone conversation that Teresa Patterson claimed at one time to have and now denies having was obtained through interception of a wire, oral or electronic communication in violation of subsection (a) of Tenn. Code Ann. §39-13-601.

(Docket No. 86-12 at 1-2). The state court concluded:

[There are] genuine issues of material fact as to whether: (a) the Defendant knew or had reason to know that the content of the telephone conversations between Nancy White and Royce Halliburton was obtained through interception of a wire, oral or electronic communication; (b) whether the Defendant intentionally used, or endeavored to use, the contents of the conversation between Nancy White and Royce Halliburton; and (c) with regard to the injunctive relief sought by Plaintiff North Central Telephone Cooperative, whether the Defendant has possession of any copies of the subject telephone conversation between Nancy White and Royce Halliburton.

(Id.). A trial date has apparently been scheduled for later in the year. (Docket No. 87 at 14).

## II.    <u>Application of Law</u>

A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir.

2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the nonmoving party must rely on more than "[c]onclusory assertions, supported only by Plaintiff's own opinions." Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008). Rather, Plaintiffs must "set out specific facts showing a genuine issue for trial." Harvey v. Campbell County, Tenn., 453 Fed. Appx. 557, 561 (6th Cir. 2011).

To defeat a motion for summary judgment on a discrimination or retaliation claim, a plaintiff must show direct or circumstantial evidence of discrimination. Barrett v. Whirlpool Corp., 556 F.3d 502, 514-15 (6th Cir. 2009) (citing DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir. 2004). In the absence of direct evidence,[6] a plaintiff's claim is subject to analysis under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green. 411 U.S. 792 (1973). The plaintiff bears the initial burden to demonstrate a prima facie case. The burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory justification for its actions. Virts v. Consol. Freightways Corp., 285 F.3d 508, 521 (6th Cir. 1999). "Once the defendant articulates its reason, the plaintiff, who bears the burden of persuasion throughout the entire process, must demonstrate that the proffered reason was a mere pretext for discrimination." Id.[7]

---

[6] Direct evidence of discrimination dictates a finding that unlawful discrimination was at least a motivating factor in the challenged employment action. Barrett, 556 F.3d at 514-15 (citing Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir. 2006)). Direct evidence of retaliation shows the plaintiff's protected activity was the but-for cause of the employer's material adverse action. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013).

[7] Defendant's Motion for Summary Judgment as to Plaintiff Nechie Woodard also rebuts claims of hostile work environment and constructive discharge. (Docket No. 82 at 11). However, while Plaintiffs may briefly mention those

## A. Discrimination Claim

Title VII's "core antidiscrimination provision" is set forth in § 703(a), which states it is unlawful for an employer to:

> (1) …fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin; or
>
> (2) …limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 62 (2006) (quoting 42 U.S.C. § 2000e-3(a)).[8]

A discrimination case brought under Title VII requires a plaintiff establish the following essential elements: "1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualification and performance, he suffered an adverse employment action, and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class." Johnson v. University of Cincinnati, 215 F.3d 561, 572-73 (6th Cir. 2000).

A plaintiff need not himself be a member of a recognized protected class to establish the first element, as Title VII protections also apply to one who is discriminated against on the basis of his or her association with a member of a protected class. Arceneaux v. Vanderbilt Univ., 25

---

phrases in their filings, Plaintiff's First Amended Complaint is limited to discrimination and retaliation under Title VII, § 1981, and the THRA. (Docket No. 25 at 10-17). Therefore, Defendant's arguments concerning hostile work environment and constructive discharge need not be examined here.

[8] Claims brought under Title VII, § 1981, and the THRA are analyzed under the same standard. See e.g., Bailey v. USF Holland, Inc., 526 F.3d 880, 885 (6th Cir.2008) (citing Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 31 (Tenn.1996)) (THRA claims); Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir.1999) (§ 1981 claims).

Fed. Appx. 345, 348 (6th Cir. 2001) (citing <u>Johnson</u> at 574); see also <u>Wanchik v. Great Lakes Health Plan, Inc.</u>, 248 F.3d 1154, 2001 WL 223742, at *12 (6th Cir. Mar. 2, 2001). There is no particular degree of association or advocacy required beyond that sufficient to show the plaintiff suffered an adverse employment action *because* of that association or advocacy.[9] Given this causal inquiry, discrimination "is more likely to correlate with more vigorous advocacy." <u>Barrett</u>, 556 F.3d at 513-14 (adopting the reasoning in <u>Drake v. 3M</u>, 134 F.3d 878, 884 (7th Cir. 1998)). In this case, Plaintiffs have not established that their limited association and advocacy on behalf of Mr. Malone, or minorities at NCTC generally, is sufficient to raise a genuine issue as to whether it caused the alleged adverse employment actions.

In <u>Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick and GMC Trucks, Inc.</u>, the Sixth Circuit found an employee had been discriminated against when he became the subject of harassment at work after his supervisor discovered he was the father of a biracial child. 173 F.3d 988 (6th Cir. 1999). This is an example of the level of "'interracial association'" that courts and the EEOC itself have recognized violates Title VII. <u>Tetro</u>, 173 F.3d at 994 (citing <u>Parr v. Woodmen of the World Life Ins. Co.</u>, 791 F.2d 888 (11th Cir. 1986) ("[w]here a plaintiff claims discrimination [in a Title VII action] based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race.")).

In <u>Johnson v. Univ. of Cincinnati</u>, the head of a university's affirmative action program successfully established that he was terminated as a consequence of his advocacy on behalf of women and minorities when he was fired after filing charges with the EEOC. 215 F.3d 561, 582

---

[9] In the context of § 703(a), an adverse employment action is defined as a "materially adverse change in the terms or conditions" of employment, <u>Laster v. City of Kalamazoo</u>, 746 F.3d 714, 727 (6th Cir. 2014) (quoting <u>Kocsis v. Multi-Care Mgmt. Inc.</u>, 97 F.3d 876, 885 (6th Cir. 1996), which could include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998).

(6th Cir. 2000). During his tenure, the plaintiff repeatedly protested the university's waiver of affirmative action hiring requirements and was subsequently excluded from hiring decisions altogether. The Sixth Circuit found that the association between the plaintiff and the protected class he advocated for was so close that "the race of minorities for which he was advocating would be 'imputed'" to him even if he himself were not a member of a protected class. Johnson, 215 F.3d at 575 (citing Tetro, 173 F.3d at 995). See also Sullivan v. Little Hunting Park, Inc., 396 U.S. 229 (1969) (finding in favor of a landlord who was expelled from his housing corporation after he protested expulsion of his black tenants from community facilities by mobilizing a community campaign, protesting, writing letters to local clergy and the housing board, and circulating a petition).

In the current case, Plaintiffs fail to put forth sufficient facts to establish a causal connection between the end of their professional relationships with NCTC and their association with Mr. Malone. Plaintiffs claim they "objected to and/or protested race and/or national origin discrimination and harassment in the workplace." (Docket No. 25 at 15). However, evidence beyond their "conclusory assertions" in the record is sparse. They explain that "[their] actions, including recommending Mr. Malone, attempted to change the pattern of racist conduct at North Central and constitute opposition to Title VII violations." (Id. at 12). Yet, their recommendations were relatively minimal – Ms. Patterson only suggested Mr. Malone be interviewed a second time in a conversation or two with Ms. White. This bears little resemblance to the consistent and vocal protest of discriminatory hiring practices that revealed a causal connection to the employee's termination in Johnson. See 215 F.3d at 575. Nor is Mr. Woodard's friendship with Mr. Malone and suggestion that he apply to NCTC sufficient, as the close association between a father and child was in Tetro. See 173 F.3d at 995. The record does not reveal Plaintiffs

advocated for or associated with Mr. Malone on such a scale as to "impute" Mr. Malone's protected status to Plaintiffs. This is not to say Plaintiffs fail the requisite degree of connection to Mr. Malone to warrant the protections of Title VII. Rather, the evidence of their association with him is so meager that it fails to raise a genuine issue as to whether it caused Ms. Patterson's termination or Mr. Woodard's alleged constructive discharge.

Moreover, the record offers very few examples of Ms. Patterson's advocacy on behalf of minorities in general. Even if all the relevant assertions are taken as true – e.g., she drafted a never-implemented affirmative action statement, tracked new hires, and questioned the Service Area requirement – they does not rise to the level of advocacy sufficient to indicate she was fired *because* of these efforts.

As Plaintiffs fail to satisfy the first element of the <u>McDonnell Douglas</u> framework, it is unnecessary to move on to the other elements. Plaintiffs rely heavily on the close temporal connection between Ms. Patterson's suggestion that Mr. Malone be interviewed a second time and her termination. However, "[t]emporal proximity is usually not enough to show causation." <u>Vaughn v. Louisville Water Co.</u>, 302 Fed.Appx. 337, 349 (6th Cir. 2008) (citing <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 566-67 (6th Cir. 2000); <u>Cooper v. City of N. Olmsted</u>, 795 F.2d 1265, 1272 (6th Cir. 1986). Where an inference of causation can be drawn, it is only relevant for the purposes of a discrimination claim when a plaintiff engaged in a *protected activity*. In the absence of a protected activity, the close proximity to other events is irrelevant. <u>See e.g.</u>, <u>Mickey v. Zeidler Tool & Die Co.</u>, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a *protected activity*, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.") (emphasis added). Plaintiffs,

who hold the burden of persuasion, fail to show membership in a protected class through their advocacy or association with a member of a protected class, thus their discrimination claim fails.

## B. **Retaliation Claim**

Section 704(a), Title VII's antiretaliation clause, protects employees from "employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Burlington, 548 U.S. at 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). The protections of this section are far-reaching, and have been interpreted broadly by the courts. See Kelley v. City of Albuquerque, 542 F.3d 802, 816-17 (10th Cir. 2008) ("The 'explicit language' of Title VII's 'participation clause is expansive and seemingly contains no limitations.'") (quoting Deravin v. Kerik, 335 F.3d 195, 203 (2d Cir. 2003)).

### 1. **Legal Standard**

Because Plaintiffs offer circumstantial evidence, their retaliation claim is also subject to analysis under the McDonnell Douglas Corp. framework. The elements of a retaliation claim are similar but distinct from those of a discrimination claim. Laster, 746 F.3d at 730 (6th Cir. 2014). A plaintiff must show that "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Jones v. Johanns, 264 Fed. Appx. 463, 466 (6th Cir. 2007) (citing Burlington, 548 U.S. at 63-64, 68 (2006) (modifying the third element, an "adverse employment action," to include "materially adverse action[s]" beyond the terms and conditions of employment)). The burden then shifts to Defendant to offer a legitimate

explanation for the challenged action, and then back to Plaintiff to rebut Defendant's explanation by showing pretext. See Virts, 285 F.3d at 521.

The antiretaliation clause protects the filing of discrimination charges with the EEOC, as well as complaints to supervisors and "less formal protests of discrimination." See Goodsite v. Norfolk Southern Ry. Co., 2014 WL 4192786 at *9 (6th Cir. Aug. 25, 2014). It applies to former employees as well as current ones. See Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997) (noting the primary purpose of the antiretaliation provision, "maintaining unfettered access to statutory remedial mechanisms," would not be furthered if an employer could "retaliate with impunity against an entire class of acts under Title VII" including complainants of discriminatory termination); see also Dunlop v. Carriage Carpet Co., 548 F.2d 139, 146 (6th Cir. 1977) (reasoning that "[t]here is no ground for affording any less protection to defendant's former employees than to its present employees" in the context of the Fair Labor Standards Act). Many circuits have noted that the "need for protection against retaliation does not disappear when the employment relationship ends." Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 884-85 (7th Cir. 1996) (collecting cases).

The scope of the antiretaliation provision extends beyond "workplace-related or employment-related acts and harm," Burlington, 548 U.S. at 68, and a plaintiff's burden to show an employer's materially adverse action is "less onerous in the retaliation context than in the antidiscrimination context." Laster, 746 F.3d at 731 (citing Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595-96 (6th Cir. 2007). A challenged action is materially adverse if a reasonable employee would find it so, meaning, "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington, 548 U.S. at 68 (internal citations omitted).

Finally, a prima facie retaliation claim requires a causal connection between the protected activity and the materially adverse action according to "traditional principle of but-for causation," meaning "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions ,of the employer." Univ. of Tex. Sw. Med. Ctr., 133 S.Ct. at 2533.

Courts in the Sixth Circuit have found that the broad scope of Title VII's antiretaliation provision may cover former employees who become the target of retaliatory lawsuits, or even counterclaims, brought by their former employers after they file charges of discrimination. In EEOC v. Outback Steakhouse of Florinda, Inc., the court noted "'a lawsuit … may be used by an employer as a powerful instrument of coercion or retaliation' and that such suits can create a 'chilling effect' on the pursuit of discrimination claims." 75 F. Supp. 2d 756, 758-61 (N.D. Ohio 1999) (denying a motion to dismiss a retaliation complaint based on employer's counterclaim in a separate, prior action for sexual harassment commenced by a former employee) (quoting Bill Johnson's Restaurants, Inc. v. National Labor Relations Bd., 461 U.S. 731, 740-41 (1983)); see also Gliatta v. Tectum, Inc., 211 F. Supp. 2d 992, 1009 (S.D. Ohio 2002) (agreeing that the language of Title VII "does not foreclose the possibility that the filing of a counterclaim can be sufficiently adverse as to amount to retaliation" and thus, the plaintiff "should be able to avail herself under the anti-retaliation provision since the language of the statute itself supports her claim."); Gill v. Rinker Materials Corporation, 2003 WL 749911 at *5 (E.D. Tenn. Feb. 24, 2003) (concluding that "the adverse action requirement for a retaliation claim encompasses an allegedly bad faith counterclaim brought by the employer against its former employee"). Cf. Arizona Motors, LLC v. Volkswagen of America, Inc., 2012 WL 523700 at *2 (N.D. Ohio, Feb. 15, 2012) (declining to extend the court's reasoning in Outback Steakhouse to actions brought

under § 1981 when the dispute involves "a potential commercial or business transaction, not an employer-employee relationship.").

Courts have also applied the antiretaliation provision in the context of post-employment blacklisting, which is "sometimes more damaging than on-the-job discrimination because an employee subject to discrimination on the job will often continue to receive a paycheck while a former employee subject to retaliation may be prevented from obtaining any work in the trade or occupation previously pursued." Veprinsky, 87 F.3d at 885. In Veprinsky, the plaintiff's former employer disclosed his pending EEOC charge to a placement firm, which subsequently ceased to share his resume with prospective employers. Id. at 894. The court agreed the plaintiff had raised a genuine issue in his retaliation claim and reversed the district court's grant of summary judgment for the defendant employer. Id. at 895. Similarly, in Dunlop, the Sixth Circuit extended the protections of the Fair Labor Standards Act to a plaintiff who was passed over for a job after a former employer notified the prospective employer of the plaintiff's previous filing of a complaint with the Department of Labor. 548 F.2d at 147. See also Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 202 (3d Cir. 1994) (finding a school board's efforts to revoke a former employee's teaching license after she brought a sexual harassment action and was subsequently terminated could "interfere with her prospects of future employment" in violation of Title VII.) .

## 2. Application

In this case, Plaintiffs have demonstrated the presence of genuine issues of fact material to their retaliation claim. Defendant's motion for summary judgment as it relates to retaliation will be denied based on the reasoning below.

First, Plaintiffs have engaged in protected activities, though perhaps not the ones they focus on in their filings. While advocating for members of a protected class can constitute a

protected activity, see Barrett, 556 F.3d at 513, this advocacy must rise to a level that constitutes "opposition to discrimination."[10] Plaintiffs fail to show their association with or advocacy on behalf of minorities at NCTC rises to this level due to the same deficiencies that prevent Plaintiffs from successfully showing membership in a protected group in the discrimination context.

Instead, the Court finds the first element of Plaintiffs' retaliation claim is satisfied by looking elsewhere – to their participation in pre-litigation mediation and filing charges of discrimination with the EEOC. Plaintiffs complained of "discriminatory practices" in a letter sent by their attorney to Defendants in May 2010. (Docket No. 113 at 11-12). The Parties agreed to mediate the dispute in an effort to settle Plaintiffs' "numerous complaints," but the mediation was unsuccessful. (Id.).

While the filing of EEOC charges may be "the most obvious form of protected activity," Silverman v. Board of Educ. of City of Chicago, 637 F.3d 729, 740 (7th Cir. 2011), Plaintiffs also participated in "less formal protests," including complaining to supervisors and mediation. Goodsite, 2014 WL 4192786 at *9; see also, Kelley, 542 F.3d at 816-17 (holding defense attorney's participation in an EEOC mediation is a protected activity pursuant to Title VII); Erbe v. Potter, 2010 WL 1052947 at *4-5 (M.D. Penn. March 22, 2010) (finding plaintiff's participation in an Equal Employment Opportunity process, both formally and informally, is a

---

[10] The Sixth Circuit historically had a high bar for what level of opposition satisfied this requirement. In Thompson v. North American Stainless, LP, the Sixth Circuit noted that in drafting Title VII's antiretaliation provision, "Congress carefully chose qualifying words of *action* ('opposed,' 'testified,' 'made a charge,' 'participated,' 'assisted'), not words of *association*." 567 F.3d 804, 816 (6th Cir. 2009) (en banc), *rev'd on other grounds* 131 S. Ct. 863 (2011). Therefore, "a plaintiff must engage in a discrete, identifiable, and purposive act of opposition to discrimination." Id. In Crawford v. Metro. Gov't of Nashville, the Supreme Court broadened the Sixth Circuit's limits on what degree of active opposition it considered a protected activity. 555 U.S. 271, 276282 (2009) (finding a plaintiff engaged in a protected activity when she complained of sexually obnoxious behavior from a coworker only in response to questions posed in the course of a sexual harassment investigation). However, this distinction is unimportant in this case where Plaintiffs engaged in other clearly protected activity – participation in mediation and filing charges of discrimination with the EEOC.

protected activity). Though Ms. Patterson was no longer employed by NCTC when she filed her first charge of discrimination, the Supreme Court has held former employees also fall within the scope of Title VII's antiretaliation provision. See Robinson, 519 U.S. at 346.

Finally, the Court notes that the failure of the underlying discrimination claim does not prevent Plaintiffs from satisfying the first element of a retaliation claim. The Court need *not* consider "the nature of the discrimination that led to the filing of the charge … rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis for the Title VII complaint." Burlington, 548 U.S. at 69 (rejecting an assertion to the contrary in Justice Alito's concurring opinion).

Because Defendant participated in the pre-litigation mediation, the second element, Defendant's knowledge of Plaintiffs' protected activity, is not an issue here. As for the third element, Plaintiffs individually faced different "materially adverse" actions by NCTC, but both establish the third element of a retaliation claim, as set forth below.

Plaintiffs claim NCTC's lawsuit in state court against Ms. Patterson is retaliation for her advocacy on behalf of minorities and her pursuit of this claim. A reasonable employee may well be deterred from asserting a discrimination claim if she believed it would motivate her employer to bring a lawsuit against her that it would not otherwise pursue. See Outback Steakhouse, 75 F. Supp. 2d at 758-61. As for Mr. Woodard, Plaintiffs raise a genuine issue as to whether NCTC's request to MasTec that he be discharged from NCTC projects was retaliation for his complaints of discrimination, participation in the mediation, and filing of EEOC charges. As the court emphasized in Veprinsky, blacklisting by a former employer may prevent an employee from working in his trade ever again. 87 F.3d at 885. This could certainly deter a reasonable employee from exercising his rights under Title VII. Thus, Plaintiffs have at least raised genuine issues

with respect to a potentially materially adverse action, which is a "relatively low bar." Michael, 496 F.3d at 596.

The final element of a prima facie retaliation claim is causation, which can be evidenced through proximity in time, Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 401 (6th Cir. 2010), or differential treatment between similarly situated employees, Nguyen, 229 F.3d at 563. Ms. Patterson was sued the day after the mediation failed. While the alleged retaliation against Mr. Woodard occurred a number of months after, a jury could find it still falls within the "short periods of time" from which the Sixth Circuit has inferred a causal link. Id. at 566-67 (quoting Parnell v. West, 1997 WL 271751 at *3 (6th Cir. 1997)). The fact that NCTC sued Ms. Patterson but not Mr. Rather, a similarly situated employee insofar as his connection to the recorded conversation is concerned, could also indicate causation. The actual but-for causation is a question of fact for the jury and Plaintiffs have raised genuine issues in this regard.

The Court thus concludes that Plaintiffs have successfully met their burden of production at the summary judgment stage to establish a prima facie Title VII retaliation claim, a task that the Sixth Circuit has characterized as "not onerous, but one easily met." Nguyen, 229 F.3d at 563. There are genuine issues of fact regarding (1) whether NCTC's lawsuit against Ms. Patterson, and communications with MasTec resulting in Mr. Woodard's discharge, are materially adverse actions, and (2) whether they were pursued because Plaintiffs engaged in protected activities.

The burden now shifts to Defendant to articulate a legitimate, nondiscriminatory justification for its actions. See Virts, 285 F.3d at 521. Plaintiff must then show Defendant's rationales are mere pretext, either because "1) the stated reason had no basis in fact; 2) the stated reason was not the actual reason; or 3) the stated reason was insufficient to explain the

defendant's actions." <u>Virts</u>, 285 F.3d at 521. Plaintiff must produce sufficient evidence to "infer that the defendants…did not honestly believe in the proffered nondiscriminatory reason" for the challenged action. <u>Tingle v. Arbors at Hilliard</u>, 692 F.3d 523, 531 (6th Cir. 2012). One way to satisfy this burden is to offer evidence from which a reasonable juror could conclude an employer provided shifting explanations for the challenged action. <u>See</u> <u>Hodges v. City of Milford</u>, 918 F. Supp. 2d 721, 742-43 (6th Cir. 2013); <u>Kumar v. Aldrich Chemical Co., Inc.</u>, 911 F. Supp. 2d 571, 590 (6th Cir. 2012).

Defendant denies that it filed the lawsuit against Ms. Patterson in retaliation for her claims of discrimination and pursuit of those claims. Instead, Defendant explains, it filed the state law claim after Ms. Patterson left the voicemail message to Ms. White claiming to have the recorded conversation as well as others. The complaint links the message with Ms. Patterson's messages to Mr. Malone where she stated "the two of us can get some big money fast" and hints that Ms. Patterson sought to engage Mr. Malone in an effort to "obtain monies from North Central Telephone Cooperative to which she was not entitled" by somehow using Mr. Rather's telephone recordings in a nefarious scheme. (Docket No. 104-24 at ¶ 12). Defendant claims it sued Ms. Patterson to "protect [its] rights under the law" and "ensure the illegally obtained recordings [are] recovered." (Docket No. 112 at 8).

Now, however, the Parties appear to agree that Ms. Patterson's message to Mr. Malone referred solely to participation in the lawsuit before this Court, rather than some amorphous conspiracy. (Docket No. 112 at 11, Docket No. 120-13 at 298-99). In this light, it is unclear what damage NCTC or Ms. White sustained as a result of the voicemail message. Ms. White's own understanding of the purpose of the state court suit, in which she is a named plaintiff, is vague at

best. She contends NCTC is pursuing the suit because "[Ms. Patterson] broke the law. We just want the law to be carried out." (Docket No. 113 at ¶ 112).

Defendant's own behavior indicates its justification may be insufficient to explain its pursuit of the state law claim and may therefore be pretext. If recovering the recordings were Defendant's true aim, one would expect NCTC to raise the issue with Ms. Patterson immediately, rather than withholding any mention until it filed the lawsuit the day after mediation failed. Furthermore, NCTC has not pursued claims against Mr. Rather, who made and distributed copies of the conversation, nor the employees who received them. In fact, for the purposes of Plaintiffs' Motion for Partial Summary Judgment as to Retaliation against Teresa Patterson, Defendant does not dispute that Ms. Patterson never heard or possessed a copy of the recording, or any others. (Docket No. 113 at ¶ 78). Defendant notes this is immaterial because the Wiretap Act only requires that she "'endeavored to use' an illegally intercepted recording," (id.), and offers the state court's denial of cross-motions for summary judgment as evidence that the lawsuit was not filed in retaliation. (Docket No. 87 at 15, 22).

Nonetheless, the Court agrees with Plaintiffs that, at least at the summary judgment stage, "[t]he key to determining whether the lawsuit is retaliatory is Defendant's motivation, not the merits of its case."[11] (Docket No. 115 at 26). The state court has reserved remaining questions until trial later this year, and the Court sees no reason to pursue them further for current purposes. They are set forth to illustrate that Defendant's stated purpose may not be the real reason it pursued the state law claim, given how it has shifted over time, or at least fails to

---

[11] In the labor dispute context, the Supreme Court held that the National Labor Relations Board may not enjoin prosecution of a state court lawsuit unless the suit (1) was brought with a retaliatory motive and (2) lacked a reasonable basis. Bill Johnson's Restaurant, 461 U.S. at 748-49. It further developed a two-part test for discerning sham litigation in the antitrust context in Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. 508 U.S. 49 (1993). However, the current case is sufficiently distinguishable from the realms of antitrust and labor disputes to survive a motion for summary judgment.

sufficiently explain this act. Taking the facts in the light most favorable to Plaintiffs, this is enough to satisfy the initial burden to show pretext at the summary judgment stage.

As for Mr. Woodard, NCTC explains that its "communications with MasTec regarding Mr. Woodard's assignment to its project were completely consistent with its prior practice of excluding former employees from contract projects" and that "Mr. Woodard was treated no differently in this respect than Mr. Wilburn, a former manager who now sits on the NCTC Board, who was also prohibited from working on an NCTC contract project after he left the company." (Docket No. 82 at 20). NCTC further specifies it did not request Mr. Woodard be fired, but merely asserted it would not work with him on NCTC projects. (Id.).

The Court does not find these explanations foreclose questions of pretext. The alleged company policy has only been applied to one other person, Mr. Wilburn, former Director of Operations. Ms. White cited his position as a supervisor specifically when explaining why she did not want Mr. Wilburn to work on NCTC projects with another company. (Docket 120-13 at 181). Conversely, there is no indication that Mr. Woodard was similarly exposed to high-level, confidential company information and long-term planning strategy, as a Director would be. Instead, an additional explanation is revealed in internal MasTec communications produced in Ms. White's deposition. In an email exhibited during that deposition, a MasTec employee reports NCTC does not want Mr. Woodard working on related projects because he sued NCTC in the current litigation:

> It has been brought to our attention…that it would be in our best interest not to allow our new hire, Nechie Woodard, to work on North Central Telephone's system…From what we understand, there may be a lawsuit pending with North Central Telephone that he is involved in…From what we have been told, the phone company does not want Nechie involved with any part of construction on our project.

(Docket No. 120-13 at 187). In her deposition, Ms. White refuted this explanation and contended instead that NCTC contacted MasTec out of a "concern that former employees should not be working on projects with current NCTC employees." (Docket No. 82 at 9). However, given the differing explanations on the record, this rationale is not sufficiently articulated as to immunize it from questions of pretext. The Court concludes that the disagreement over the actual explanation for NCTC's request to MasTec raises genuine issues as to whether the Cooperative's motive was retaliatory. These are questions of fact that should be resolved by a jury.

Based upon the foregoing, the Court will deny Defendant's Motion for Summary Judgment as it relates to Plaintiff's retaliation claim.

### III.   Conclusion

On the basis of the foregoing, (1) Defendant's Motion for Summary Judgment as to Plaintiff Teresa Patterson will be GRANTED with respect to Plaintiffs' discrimination claim and DENIED with respect to Plaintiffs' retaliation claim; (2) Defendant's Motion for Summary Judgment as to Plaintiff Nechie Woodard will be GRANTED with respect to Plaintiffs' discrimination claim and DENIED with respect to Plaintiffs' retaliation claim

An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE